**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| LAURENCE T. McKINNEY, M.D. | : | NO. 09-234 |

## MEMORANDUM RE: MOTIONS TO SUPPRESS

Defendant in this case has filed two motions to suppress evidence he alleges was unlawfully obtained. Specifically, Defendant seeks to suppress the following: (1) statements he made to law enforcement agents during a search of Defendant's office on February 5, 2008; (2) statements he made at a Drug Enforcement Agency ("DEA") Administrative Hearing on April 7, 2008; and (3) physical evidence obtained as a result of a search of Defendant's office and vehicle on February 5, 2008. After considering Defendant's suppression motions and the arguments contained therein, the Court denies Defendant's motions to suppress.

## I.     Factual and Procedural Background

### A.     Facts

#### 1.     General Case History

Defendant, Dr. Laurence T. McKinney ("Dr. McKinney"), is a physician licensed in Pennsylvania who operated the McKinney Medical Center, a solo practice located at 7514 Frankford Avenue in Philadelphia, Pennsylvania. Dr. McKinney was registered with the DEA, DEA registration number BM7201267, to dispense to patients certain controlled substances. His registration was set to expire on January 31, 2010.

In November 2007, the DEA began receiving complaints from several local pharmacies

about receiving an excessive amount of prescriptions for Percocet and Xanax from Dr.

McKinney.  Also in November 2007, the Philadelphia Police Department received a complaint

from an anonymous citizen regarding Dr. McKinney's prescribing practices.  The DEA's

Diversion Unit and the Philadelphia Police Department's Intensive Drug Investigative Squad

("IDIS") subsequently launched an investigation into Dr. McKinney's prescribing practices.

During the investigation, numerous surveillances, including audio and video surveillances, were

conducted.  Also during the investigation, undercover IDIS agents visited Dr. McKinney's

medical office posing as patients in order to acquire prescriptions for controlled substances.[1]

These undercover visits were recorded with a "Hawk8A" transmitter/microphone/camera, and

DEA and IDIS agents who were positioned across the street from Dr. McKinney's office during

the undercover office visits monitored the audio feed in real-time.

Also during the investigation, DEA obtained a Commonwealth of Pennsylvania Bureau

of Narcotics Investigation "BD6 report," which identified more than 3,000 prescriptions for

certain controlled substances dispensed by pharmacies in Pennsylvania on the order or

prescription of Dr. McKinney from October 5, 2004 until November 30, 2006.  DEA later sought

an opinion from an expert, a physician named "Dr. Woodie," who concluded that Dr.

McKinney's prescribing patterns, as evidenced in the BD6 report, were not consistent with the

dispensing of controlled substances for a legitimate medical purpose.  Additionally, IDIS agents

observed Dr. McKinney and another individual making trips on multiple occasions from Dr.

McKinney's office to his vehicle – a 1997 Mercedes-Benz sedan – and placing unidentified items

---

[1] These undercover visits to Dr. McKinney's office occurred on December 4, 2007, December 14, 2007, January 3, 2008, January 18, 2008, January 22, 2008, and January 30, 2008.

in the vehicle's glove compartment and trunk, or accessing the trunk area. The agents also observed Dr. McKinney driving from his medical office to local banks during business hours.

As a result of the DEA/IDIS investigation, DEA Diversion Investigator James Corbett ("DI Corbett") prepared and compiled affidavits for search warrants for Dr. McKinney's office and vehicle. The search warrants were issued by United States Magistrate Judge Linda K. Caracappa.

## 2. The Search

On February 5, 2008, shortly after 5:00 p.m., a team of approximately twenty (20) law enforcement officers, including DEA and IDIS agents (the "agents"), executed the search warrants upon Dr. McKinney's medical office and vehicle. During the search, Dr. McKinney was not handcuffed or restrained in any way, and was not isolated to any particular area of his office. Dr. McKinney was specifically told that he was not under arrest, and he was not read his Miranda rights. (2/4/10 Hearing Audio File #1 at 21:44-22:00 (Doc. No. 44).) When asked, the agents told Dr. McKinney that he was free to leave at any time, but that the agents preferred he remain in order to observe the search and secure his business and personal belongings that were not the subject of the search. (2/4/10 Hearing Audio File #1 at 22:36-23:47 (Doc. No. 44).) DI Corbett noted that Dr. McKinney appeared to be under the influence of alcohol or narcotics, as he appeared to be sluggish and drowsy, and was slightly slurring his speech. When asked about this, Dr. McKinney stated that he was not under the influence of alcohol or narcotics, but instead was tired.

At approximately 6:00 p.m., the agents asked Dr. McKinney to voluntarily surrender his DEA Certificate of Registration, which authorized Dr. McKinney to dispense certain controlled

substances.  Dr. McKinney responded that he wanted to speak with counsel before surrendering his registration, but he was unable to reach counsel via telephone.  Directly thereafter, agents served Dr. McKinney with a notice of Immediate Suspension of Registration, which prohibited Dr. McKinney from ordering, administering, prescribing, possessing, or dispensing any controlled substance with his DEA registration.

During the search, Dr. McKinney assisted the agents by identifying patient files that were closed and not covered by the warrant, and by identifying the supplier or distributor of the controlled substances and medications found in his office.  At some point during the search, DI Corbett began conversing with and questioning Dr. McKinney.  Dr. McKinney eventually told DI Corbett that he no longer wished to speak to him or answer his questions.

Sometime after 9:00 p.m., DI Corbett approached Dr. McKinney and presented him with a target letter informing Dr. McKinney that he was the target of a federal drug investigation.  Dr. McKinney again asked if he was being arrested, and DI Corbett responded that Dr. McKinney was not being arrested at that time, although he stated his belief that Dr. McKinney could face criminal charges at some point in the future.  DI Corbett and Dr. McKinney then had a conversation which lasted somewhere between thirty (30) and forty-five (45) minutes, in which Dr. McKinney provided information about how he ran his medical practice.

The search concluded at approximately 10:00 p.m.  As a result of the office search, the agents seized, among other things, prescription medication, computer equipment, VHS tapes, and thirty-one (31) boxes of medical records.  As a result of the vehicle search, the agents seized prescription pills and documents.  The agents provided Dr. McKinney with a receipt for items that were seized.

### 3.    <u>DEA Administrative Hearing</u>

On April 7, 2008, Dr. McKinney appeared before Administrative Law Judge ("ALJ") Mary Ellen Bittner at a DEA Administrative Hearing in Washington, D.C., to address the suspension of Dr. McKinney's DEA registration.  Dr. McKinney was represented at this hearing by Joseph Grimes, Esq.  At the hearing, Dr. McKinney did not assert his Fifth Amendment rights, and instead, testified as an adverse witness during the government's case-in-chief.  On May 5, 2008, the ALJ issued her recommended decision against Dr. McKinney.  On July 17, 2008, the Deputy Administrator adopted the ALJ's conclusions of facts and law, concluding that Dr. McKinney's continued registration with the DEA would be inconsistent with the public interest, and formally revoking Dr. McKinney's DEA registration.

### B.    <u>Procedural History</u>

On April 8, 2009, a grand jury returned a forty-nine (49) count indictment charging that between July 2007 and January 2008, Dr. McKinney distributed controlled substances in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and (b)(1)(D)(2), maintained a place for the illegal distribution of a controlled substance in violation of 21 U.S.C. § 856(a)(1), and aided and abetted the distribution of controlled substances in violation of 18 U.S.C. § 2.

On January 14, 2010, Defendant filed a Motion to Suppress Statements (Doc. No. 35), which he supplemented later that day (Doc. No. 36).  On January 21, 2010, Defendant filed a Motion to Suppress Physical Evidence (Doc. No. 38).  The government responded to Defendant's Motion to Suppress Statements on January 25, 2010 (Doc. No. 39), and to Defendant's Motion to Suppress Physical Evidence on January 28, 2010 (Doc. No. 41).

This Court held a hearing on February 4, 2010 to examine Defendant's suppression

motions, at which the Court heard testimony from DI Corbett (2/4/10 Hearing Audio File #1 at 03:02-1:04:30 (Doc. No. 44), and 2/4/10 Hearing Audio File #2 at 18:27-49:35 (Doc. No. 45)) and Joseph Grimes, Esq. (2/4/10 Hearing Audio File #2, at 00:30-17:20 (Doc. No. 45)). Subsequently, the parties were instructed to submit further briefing on the suppression issues. Defendant filed a Supplemental Brief in Support of Motions to Suppress Statements and Physical Evidence on February 15, 2010 (Doc. No. 55), and augmented his Supplemental Brief via written correspondence to the Court dated February 22, 2010. The government responded to Defendant's Supplemental Brief on February 22, 2010 (Doc. No. 56).

## II. Analysis

### A. Suppression of Statements Made to Law Enforcement Agents During the February 5, 2008 Search of Dr. McKinney's Office

In Defendant's Motion to Suppress Statements, Supplemental Brief, and February 22, 2010 letter to the Court augmenting his Supplemental Brief, Defendant argued that the statements he made to DEA and IDIS agents during the February 5, 2008 search: (1) were taken in violation of Dr. McKinney's rights under Miranda v. Arizona, 384 U.S. 436 (1966); (2) were involuntary because the agents continued conversing with and questioning Dr. McKinney after he asked to speak with counsel; and (3) were taken in violation of Edwards v. Arizona, 451 U.S. 477 (1981), because DI Corbett questioned Dr. McKinney on multiple occasions after Dr. McKinney requested to speak to counsel.

The central principle established in Miranda is that "if the police take a suspect into custody and then ask him questions without informing him of [his rights], his responses cannot be introduced into evidence to establish his guilt." Berkemer v. McCarty, 468 U.S. 420, 429

(1984). Thus, constitutional protections against self-incrimination under the Fifth Amendment are triggered only when a suspect is subject to "custodial interrogation." Thompson v. Keohane, 516 U.S. 99, 102 (1995). Custodial interrogation occurs when law enforcement officials initiate questioning "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. (quoting Miranda, 384 U.S. at 444). A defendant is in custody when a reasonable person in the defendant's position would perceive that he or she is not free to leave. Stansbury v. California, 511 U.S. 318, 325 (1994); see also Berkemer, 468 U.S. at 442 (when determining if a suspect is "in custody," the only relevant inquiry is how a reasonable person in the suspect's position would have understood his or her situation).

In the present case, both Defendant and the government correctly recognize that Miranda is only implicated if Defendant was subjected to custodial interrogation. Nevertheless, the parties dispute whether Dr. McKinney was in custody when he answered the agents' questions and made the statements he now seeks to suppress. It is the resolution of this question that determines whether the statements made by Dr. McKinney during the search are admissible, or must be suppressed.[2]

A person is in custody when he or she is arrested formally, or when his or her freedom of

---

[2] For purposes of determining whether Dr. McKinney was subject to custodial interrogation, the Court finds that the questions posed to Dr. McKinney by the agents constituted an "interrogation." An interrogation refers "to any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Here, the agents first asked Dr. McKinney to voluntarily surrender his DEA Certificate of Registration, subsequently served Dr. McKinney with a Notice of Immediate Suspension, and later presented Dr. McKinney with a target letter notifying him that he was the subject of a federal drug investigation. While the Court has not been made aware of the specific questions posed to Dr. McKinney by DI Corbett and/or other agents during the course of the search, the Court finds that the agents should have known that their questions to Dr. McKinney were reasonably likely to elicit an incriminating response from him. This is not to say that the Court believes the agents were certain or knew that their questions would lead to an incriminating response, but only that their questions were reasonably likely to elicit an incriminating response. For this reason, the questions asked of Dr. McKinney in this case qualify as "interrogation."

movement is restricted to the degree associated with a formal arrest. United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006) (citation omitted). For a person to be in custody when he or she has not been arrested, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." Id. (quoting Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974)). "Custodial interrogation" is "not susceptible of an exact definition; thus, the determination of whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis." United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999).

The Supreme Court has made clear that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323 (emphasis added). The Third Circuit has set forth five factors to assist courts in determining whether a person was in custody: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning. Willaman, 437 F.3d at 359-60 (citations omitted).

In conducting its analysis, the Court notes that Judge DuBois' recent opinion in United States v. Kofsky, 2007 WL 2480971 (E.D. Pa. Aug. 28, 2007), addressed a suppression motion in a factual circumstance similar to the present case. Because the facts and analysis in Kofsky are directly on-point, the Court finds Judge DuBois' holding instructive in the present case. The

8

Court will briefly explain the facts and holding in <u>Kofsky</u> below.

In <u>Kofsky</u>, the defendant was a practicing medical doctor charged with various crimes in connection with his distribution of prescription diet pills through his medical practice. The defendant filed motions to suppress evidence seized during searches of his residence, medical office, safety deposit boxes, and vehicle, as well as to suppress statements he made to DEA and Federal Bureau of Investigation ("FBI") agents during the search of his residence. <u>Id.</u> at *1. Regarding the statements made to DEA and FBI agents during the search of the defendant's residence, Judge DuBois held that the defendant was <u>not</u> in custody when he spoke with the agents, and thus, the government was <u>not</u> required to give the defendant <u>Miranda</u> warnings, or stop questioning him after the defendant requested to speak to counsel. <u>Id.</u> at *27-28.

In addressing the Third Circuit's five factor test, Judge Dubois reasoned as follows: First, the agents told the defendant he was not under arrest and was free to leave if he so desired. <u>Id.</u> at *27. Second, the questioning took place in the kitchen of the defendant's home, "and not in a more coercive setting, such as a police station." <u>Id.</u> Third, there was no evidence of "coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement." <u>Id.</u> Fourth, the defendant voluntarily agreed to speak to the agents. <u>Id.</u> Fifth, the defendant was permitted to move throughout the house while the search was being undertaken by the agents. <u>Id.</u> Judge DuBois pointed out that while it is "not dispositive that the questioning took place in [the defendant]'s home," "the location clearly made it less likely, given the other circumstances, that a reasonable person . . . would have felt he was unable to end the questioning." <u>Id.</u> at n.22 (quoting <u>United States v. Vidal</u>, 85 Fed. Appx. 858, 862 n.2 (3d Cir. 2004)).

Judge DuBois then addressed the three coercive aspects to the search that the defendant argued existed, and that the Judge agreed existed. First, Judge Dubois noted that the search was conducted by "twenty-three agents, most of whom were armed, and who wore agency wind-breakers or vests with agency initials." Id. Second, the defendant had been physically restrained and detained in the foyer of his home "for five to ten minutes at the start of the search." Id. Third, "agents accompanied [defendant] at all times [during the search] 'to protect the integrity of the search' and for safety reasons." Id. Judge DuBois ultimately held the following:

> Having considered this evidence, the Court concludes that under the totality of the circumstances[,] these coercive aspects of the search did not convert the interview of [the defendant] into a custodial interrogation. The presence of armed and uniformed agents and a brief detention during a protective sweep are characteristics of many searches and do not create a custodial interrogation per se. Moreover, although [an agent] testified that [the defendant] was not free to go during the protective sweep of the residence, he did not handcuff [defendant], display any weapons, or state that [defendant] was not free to leave after the protective sweep. Under the circumstances, the Court concludes that [defendant] was not "in custody" . . . and that [the agents] were not required to Mirandize him.

Id. at *27-28 (emphasis added) (internal citation omitted).

One additional factor that arose in Kofsky was that during the search, the agents continued to question the defendant after he had asked to speak to counsel. Regarding this issue, Judge DuBois held that "[u]nder the circumstances, the Court concludes that [the defendant] was not 'in custody' . . . and that [the agents] were not required to Mirandize him. Accordingly, the Court also rejects defendant's argument that the agents [were required] to stop questioning him after he requested counsel." Id. at *28 (emphasis added) (citing United States v. McNaughton, 848 F. Supp. 1195, 1200 (E.D. Pa. 1994) (holding that where defendant was not subject to custodial interrogation, agent did not violate the Fifth Amendment by contacting defendant for

questioning after defendant refused to answer questions without a lawyer present)).

In the present case, as in <u>Kofsky</u>, the Court begins its analysis by addressing the Third Circuit's five factor test to determine whether Dr. McKinney was in custody when he made the statements he now seeks to suppress. First, the agents specifically told Dr. McKinney that he was not under arrest and was free to leave, and did not handcuff or physically restrain him at any time. These facts weigh against a finding of custody. Indeed, Third Circuit has stated that where an agent informs a suspect that he or she is not under arrest, this fact weighs against a finding of custody. <u>See</u> <u>Reinert v. Larkins</u>, 379 F.3d 76, 86 (3d Cir. 2004) ("Had [the officer] made an explicit statement [to the suspect] that he was not under arrest or that he need not answer questions, such a statement would surely have bolstered the government's contention that [the] questioning was non-custodial in nature."); <u>see also</u> <u>United States v. May</u>, 87 Fed. Appx. 223, 227 (3d Cir. 2004) (finding a defendant was not "in custody" and thus was not subject to custodial interrogation where "[t]he interview was conducted . . . in familiar surroundings – his home. The police never indicated they would not heed a request to leave; on the contrary, [the defendant] was told that he was not under arrest and that he could terminate the interview at any time. Moreover, [the defendant]'s freedom of movement . . . was not restricted.").

Second, the search took place in Dr. McKinney's office, and not at a police station. While not in the evidence, the government's reply brief indicates that Dr. McKinney was living in his office space at the time of the search, and had clothing, watches, and money present – facts that Dr. McKinney does not dispute. Thus, that the search occurred in Dr. McKinney's office – the place where he both worked and resided at the time of the search – "militates against a custody finding." <u>United States v. Hills</u>, 2009 WL 5209407, at *6 n.14 (E.D. Pa. Dec. 23, 2009)

(citing Vidal, 85 Fed. Appx. at 861 (the fact that federal agents questioned the suspect in his own home "clearly made it less likely, given the other circumstances, that a reasonable person in [his] position would have felt he was unable to end the questioning"); United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) ("[w]hen a person is questioned 'on his own turf,' . . . we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'"); United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) ("'courts are much less likely to find [custody] when the interrogation occurs in familiar . . . surroundings,' such as the suspect's home")).

Third, the Court notes that the length of time of the search – nearly five hours – weighs slightly in favor of a finding of custody. Indeed, DI Corbett first began speaking to Dr. McKinney early in the search, at around 6:00 p.m., and approximately three hours after Dr. McKinney told DI Corbett that he did not wish to speak to him, DI Corbett again began speaking with Dr. McKinney, at around 9:00 p.m. Even given the Court's conclusion that the length of time of the search weighs slightly in favor of custody, "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial." United States v. Killingsworth, 118 Fed. Appx. 649, 651-52 (3d Cir. 2004) (citing Beckwith v. United States, 425 U.S. 341, 342-45 (1976) (three hours); United States v. Wolk, 337 F.3d 997, 1006-07 (8th Cir. 2003) (an hour and twenty minutes); Czichray, 378 F.3d at 825 (seven hours); Leese, 176 F.3d at 744-45 (one hour)).

Fourth, the agents did not use coercive tactics such as hostile tones of voice or the display of weapons, nor did they physically restrain Dr. McKinney. DI Corbett, in particular, did not carry a weapon or handcuffs. Defendant argues that Dr. McKinney was guarded by an agent for

the duration of the search who remained close to Dr. McKinney, including when Dr. McKinney went outside to smoke a cigarette, and who waited outside the bathroom when Dr. McKinney entered. The Court finds Judge DuBois' holding in Kofsky on this point instructive: Judge DuBois held that the fact that agents accompanied the defendant "at all times [during the search] to protect the integrity of the search' and for safety reasons" – a fact which Judge DuBois acknowledged was a coercive element – did not convert the questioning into a custodial interrogation. Id. at *28. Here, similarly, DI Corbett testified that an agent was assigned to stay by Dr. McKinney during the search for security reasons, and to make sure that no evidence was destroyed. The Court finds this to be a reasonable precaution taken by the agents on the scene during the execution of a search warrant in a suspect's office. Additionally, the Court points out that in Kofsky, agents physically restrained the defendant for five to ten minutes at the start of the search. Id. Here, Dr. McKinney was not physically restrained at any point.

Regarding the fifth factor – whether Dr. McKinney voluntarily submitted to questioning – Defendant spends a great deal of his briefing arguing that Dr. McKinney's statements were not made voluntarily because he had asked to speak to counsel. The government, on the other hand, argues that Dr. McKinney only sought to speak to counsel regarding the voluntary surrender of his DEA Certificate of Registration, and that his answers to all of the questions posed to him throughout the search were made voluntarily. In addressing this issue, the Court notes that the evidence indicates that Dr. McKinney did express a desire to speak with counsel upon the agents' request for him to voluntarily surrender his DEA Certificate of Registration, and at a later point in time when DI Corbett was speaking with him, did indicate that he no longer wished to speak with DI Corbett. Dr. McKinney also spoke to DI Corbett later in the search, after being

13

presented with a federal target letter.

This factor is not, as Defendant seems to argue, dispositive to the issue of whether Dr. McKinney was in custody. The Court believes that, after weighing the totality of the circumstances in this case, Dr. McKinney was <u>not</u> in custody during the search of his office. Thus, the fact that he asked to speak to counsel early in the search does not require suppressing the statements he subsequently made to the agents. <u>See</u> <u>Kofsky</u>, 2007 WL 2480971, at *28 (after finding that defendant was not in custody during the execution of a search warrant, the court found it lawful for agents to question defendant after he had requested counsel, and statements made in response to these questions were not suppressed (citing <u>United States v. McNaughton</u>, 848 F. Supp. 1195, 1200 (E.D. Pa. 1994))). Indeed, in <u>McNaughton</u>, Judge Brody stated:

> [Defendant argues] that the government violated his rights under <u>Miranda</u> and [<u>Edwards</u>] when [an agent] re-initiated the questioning of [defendant] after [the defendant] had invoked his Fifth Amendment right to have counsel present during questioning. . . . The protections of <u>Miranda</u> and <u>Edwards</u>, however, <u>only apply to custodial interrogation</u>. Because I have held that [defendant] was <u>not</u> subjected to custodial interrogation . . . I also hold that [the agent] <u>did not violate</u> the Fifth Amendment by contacting [defendant] for further questioning <u>after he had once refused to answer questions without a lawyer present.</u>

<u>McNaughton</u>, 848 F.Supp. at 1200 (emphasis added) (citing <u>Arizona v. Roberson</u>, 486 U.S. 675, 685 (1988) (the Fifth Amendment right to counsel during custodial interrogation is meant to protect an accused against "the inherent pressures of custodial interrogation"); <u>Edwards</u>, 451 U.S. at 482 ("Miranda thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation.")). Thus, here, because the Court finds that Dr. McKinney was not in custody during the search of his office and therefore was not subject to custodial interrogation, Dr. McKinney's rights under <u>Miranda</u> and <u>Edwards</u> were not violated

when the agents continued to question him after he requested to speak to counsel.  See May, 87 Fed. Appx. at 227 ("Miranda warnings are only required if a statement was the product of 'custodial interrogation.'") (citing Miranda, 384 U.S. at 444); Brosius v. Warden, United States Penitentiary, Lewisburg, PA, 278 F.3d 239, 249 (3d Cir. 2002) ("Edwards applies only where the suspect makes a request for counsel while in custody.  Here, because [petitioner] was not in custody . . . , Edwards does not apply." (citations omitted) (emphasis in original)).

For the aforementioned reasons, and after careful consideration of the facts and the totality of the circumstances in the present case, the Court finds that Dr. McKinney was not in custody during the search of his office on February 5, 2008.  Therefore, any statements made by Dr. McKinney in response to questioning by DI Corbett or any other agent during the search are admissible at trial.

**B.    Suppression of Statements Made at DEA Hearing**

Defendant next argues that Dr. McKinney's statements at the DEA hearing should be suppressed because Dr. McKinney's testimony was not given voluntarily.  Defendant argues that Dr. McKinney's failure to testify at the DEA hearing would have resulted "in the certain loss of his livelihood" because "a doctor simply cannot function without the ability to prescribe medicine."  (Def.'s Mot. to Suppress Statements at 7.)  Defendant thus argues that because Dr. McKinney "had to testify at the hearing in order to exonerate himself," "this was a lose-lose situation. . . .  If Dr. McKinney failed to testify, an adverse inference could be drawn; if Dr. McKinney testified[,] [the DEA prosecutor] had obtained a plethora of statements that he could (and did) readily furnish to the government in the criminal prosecution."  (Def.'s Mot. to Suppress Statements at 8.)

The government responds by arguing that Defendant knowingly waived his Fifth Amendment rights at the hearing, was represented by counsel, Joseph Grimes Esq., at the hearing, and that at the suppression hearing before this Court, Mr. Grimes testified that he discussed with Defendant the option of staying the DEA hearing until the criminal prosecution was resolved, but Defendant elected to go forward with the DEA hearing. The government thus argues that Defendant voluntarily chose to testify at the DEA hearing to prove that his DEA registration to prescribe medicine should have been be reinstated, and thus voluntarily waived his Fifth Amendment rights.

In deciding this issue, the Court notes that neither Defendant nor the government cites to any relevant case law addressing the specific issue at hand. Defendant argues that the Supreme Court's holding in Garrity v. State of New Jersey, 385 U.S. 493 (1967), applies to the facts at issue here. The Court disagrees, and finds that Defendant's reliance on Garrity is misplaced.

In Garrity, 385 U.S. 493 (1967), the Supreme Court assessed whether a state government could use the threat of discharge to obtain inculpatory statements from its employees. There, police officers subject to internal investigation were asked self-incriminating questions, and were told that their refusal to answer the questions would result in their discharge. Id. at 497 ("The choice imposed on petitioners was one between self-incrimination or job forfeiture."). The Supreme Court held that if a public employee has to choose between either self-incrimination or termination of his or her employment, the employee's privilege against self-incrimination has been violated: "We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office." Id. at 500 (emphasis added).

The present case is distinguishable from Garrity. It is true that here, as in Garrity, Dr. McKinney was faced with a choice: At the DEA hearing, he either could have chosen to assert his Fifth Amendment rights, knowing that the ALJ properly could have drawn an adverse inference from his failure to testify,[3] or he could have chosen to testify at the hearing, and risk making incriminatory statements. Either way, the choice faced by Dr. McKinney is distinguishable from the choice faced by the police officers in Garrity, where the police officers were forced to either testify, or assert their Fifth Amendment privilege and face immediate job termination.

Indeed, the facts here are more akin to those in Baxter v. Palmigiano, 425 U.S. 308 (1976), where the Supreme Court held that a prison disciplinary proceeding did not violate an inmate's Fifth Amendment privilege, in part, because the State had not "insisted [nor] asked that [the inmate] waive his Fifth Amendment privilege," and it was "undisputed that an inmate's silence in and of itself [was] insufficient to support an adverse decision by the Disciplinary Board." Id. at 317-318 (emphasis added). The Supreme Court has distinguished Garrity from cases like Baxter "because in [Garrity] the 'refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to other evidence, resulted in loss of employment or opportunity to contract with the State,' whereas [the inmate in Baxter]'s silence 'was given no more evidentiary value than was warranted by the facts surrounding his case.'" McKune v. Lile, 536 U.S. 24, 60-61 (2002) (emphasis added) (citations omitted). The

---

[3] The Court notes that administrative fact-finders are generally permitted to draw adverse inferences from a defendant's failure to testify. "[T]he prevailing rule is that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.'" Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (quoting 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961) (emphasis in original)).

Supreme Court has stated:

> [Baxter] involved an administrative disciplinary proceeding in which the respondent was advised that he was not required to testify, but that if he chose to remain silent his silence could be considered against him.  Baxter did no more than permit an inference to be drawn in a civil case from a party's refusal to testify.  Respondent's silence in Baxter was only one of a number of factors to be considered by the finder of fact in assessing a penalty, and was given no more probative value than the facts of the case warranted; [in cases like Garrity], refusal to waive the Fifth Amendment privilege [led] automatically and without more to imposition of sanctions.

Lefkowitz v. Cunningham, 431 U.S. 801, 808 n.5 (1977).  In the present case, as in Baxter – and unlike in Garrity – Dr. McKinney's potential silence was only one of a number of factors to be considered by the ALJ when making her determination, and his potential silence would have been given no more probative value than the facts of his case warranted.

Garrity having been distinguished, the Court now addresses the specific issue of whether the statements made by Dr. McKinney at his DEA hearing must be suppressed at his subsequent criminal trial.  While this exact legal question has not been addressed by the Supreme Court or Third Circuit, various Circuit Courts of Appeals have dealt with the analogous issue of whether statements made at an administrative hearing can be lawfully admitted at a subsequent criminal trial where a defendant faced the same pressures that Dr. McKinney claims to have faced at his DEA hearing.  While these cases are not binding on this Court, their guidance is instructive, and their holdings are therefore adopted for purposes of resolving this question.

In Arthurs v. Stern, 560 F.2d 477 (1st Cir. 1977), a Massachusetts physician accused of writing illegal prescriptions brought an action in federal court to require that the Massachusetts disciplinary board suspend disciplinary proceedings against him until criminal charges arising out of his alleged activities were disposed of.  Id. at 478.  The physician argued that:

18

> [T]he disciplinary board would draw an adverse inference from his silence if he invoked his privilege against self-incrimination at the [disciplinary board's] hearing. The threat of losing his license . . . would force him to testify, . . . and mak[e] statements that might be used against him in the criminal trial.

Id. In evaluating the physician's claim, the First Circuit held that there was "[nothing] inherently repugnant to due process in requiring the doctor to choose between giving testimony at the disciplinary hearing, a course that may help the criminal prosecutors, and keeping silent, a course that may lead to the loss of his license." Id. at 478-79 (emphasis added).

Similarly, in Keating v. Office of Thrift Supervision, 45 F.3d 322 (9th Cir. 1994), the United States Office of Thrift Supervision ("OTS") – the federal agency charged with regulating federal savings associations – held a hearing, the result of which was that the plaintiff was banned from the federally insured banking industry and was required to pay nearly thirty-six (36) million dollars in restitution. Id. at 324. The plaintiff appealed to the Ninth Circuit, arguing, inter alia, that his due process rights were violated by OTS' refusal to stay the hearing until after the conclusion of state and federal criminal proceedings because the pending criminal proceedings forced him to invoke his Fifth Amendment privilege during the hearing, thus depriving him of an opportunity to testify on his own behalf. Id. The Ninth Circuit found the plaintiff's argument "unpersuasive," holding that "[a] defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege. . . . [I]t is permissible to conduct a civil proceeding at the same time as a related criminal proceeding . . . ." Id. at 326 (emphasis added).

Here, Dr. McKinney's argument uses the same logic as the arguments set forth in Arthurs

and <u>Keating</u>:  Dr. McKinney argues that he was forced to choose at the hearing whether to

(1) testify, and risk making incriminatory statements that could be admissible in a subsequent

criminal prosecution, or (2) assert his Fifth Amendment privilege and risk the trier of fact

drawing an adverse inference from his silence.  In light of the Circuit Court holdings in <u>Arthurs</u>

and <u>Keating</u>, and in light of the Supreme Court's decisions which distinguish <u>Garrity</u> from cases

like the present case, the Court finds that the statements made by Dr. McKinney at the DEA

hearing are admissible in the current criminal prosecution against him, and that his Fifth

Amendment rights were not violated when he chose to testify at the DEA hearing.  As the Fifth

Circuit stated in <u>Luman v. Tanzler</u>, 411 F.2d 164 (5th Cir. 1969), <u>cert denied</u> 396 U.S. 929

(1969), a case where a suspended police officer sought to have his administrative hearing

continued in light of pending criminal proceedings against him, "[a]t the administrative hearing

[the officer] will have a free choice to admit, to deny, or to refuse to answer.  This is <u>full</u>

<u>vindication of the Fifth Amendment privilege against self-incrimination</u>."  <u>Id.</u> at 167 (footnote

omitted) (emphasis added).  Here, similarly, Dr. McKinney, while fully represented by counsel at

his DEA hearing, was able to choose whether or not he wanted to testify.  Thus, Dr. McKinney

was able to fully vindicate his Fifth Amendment rights.

     **C.**      **<u>Suppression of Physical Evidence Obtained During Search of Office and</u>**
             **<u>Vehicle</u>**

     Defendant argues that the facts set forth in the affidavits did not indicate a fair probability

that evidence of illegal drug distribution would be found in Dr. McKinney's office or vehicle.

Specifically, Defendant argues that the affidavits lacked probable cause because:  (1) there was

nothing about the circumstances of the undercover visits that would warn a reasonable person

that an offense had been committed; (2) while the affidavits put great weight on the fact that the officers paid in cash for their appointments, there is nothing illegal per se about doctors accepting cash payments for their services; (3) the search of the office and vehicle was overbroad; and (4) the good faith exception to exclusionary rule does not apply.

The government counters that the warrant was supported by probable cause, arguing that the affidavits were extraordinarily detailed and provided ample probable cause for the searches, and that, in any event, the "good faith" exception to the exclusionary rule, as adopted in United States v. Leon, 468 U.S. 897 (1984), applies. Further, the government argues that the search warrant satisfied the particularity requirement of the Fourth Amendment, and was not overly broad.

### 1.    **Probable Cause**

A magistrate judge may find probable cause when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). When a warrant is issued and later challenged, "a deferential standard of review is applied in determining whether the magistrate judge's probable cause decision was erroneous." United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 146 (3d Cir. 2002). The reviewing court inquires whether there was a "substantial basis" for finding probable cause, as "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." Id. Under governing precedent, "[d]irect evidence linking the place to be searched to the crime is not required for the issuance of a search warrant." Hodge, 246 F.3d at 305 (quotation omitted).

Instead, probable cause can be, and often is, "inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment[,] and normal inferences about where a criminal might hide' the fruits of his crime." Id. (quotation omitted). The resolution of "doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Ninety-Two Thousand, 307 F.3d at 146-47.

After review, the Court finds that the affidavits were not so deficient in probable cause as to leave the magistrate judge without a substantial basis upon which to conclude that there was a fair probability that evidence of Dr. McKinney's alleged criminal activity would be found in his office or vehicle. To the contrary, the affidavits provided great detail regarding Dr. McKinney's potentially criminal prescribing practices that had been extensively investigated by experienced law enforcement agents. The affidavits summarized Dr. McKinney's suspected unlawful conduct; described the applicable laws pertaining to prescribing controlled substances; described physician responsibilities with regard to distributing and dispensing controlled substances, particularly with regard to obtaining a patient's medical history and maintaining prior records; and summarized the DEA/IDIS investigation by providing details of the agents' undercover visits to Dr. McKinney's office and the surveillance conducted outside Dr. McKinney's office, which included descriptions of patient foot traffic, the duration of time patients spent inside the office, and Dr. McKinney's actions regarding placing items into his vehicle and driving the vehicle from his office to local banks.

First and foremost, the affidavits describe several instances where undercover IDIS agents visited Dr. McKinney's medical practice, paid him $100 for the visit, and obtained prescriptions for controlled substances without a medical examination, without Dr. McKinney referring to any

patient or medical file, or without providing Dr. McKinney with a medical condition or injury. The Court's review of the audio transcripts of these undercover visits indicates that these instances did occur. The Court briefly describes some of these instances below, all of which were discussed in the affidavits:

- On January 3, 2008, Officer Floyd visited Dr. McKinney's office using the name "Anthony Wilson." Neither Dr. McKinney nor his nurse could find Officer Floyd's patient file or medical chart from his prior visit on December 14, 2007, but when Officer Floyd asked Dr. McKinney "I don't have to fill out the paperwork again, or did she find my file?", Dr. McKinney responded "No, that's alright. . . . I saw it the other day . . . ." (TR. 1/3/2008 N-6, at 14:48:29.) Dr. McKinney subsequently prescribed Xanax and Percocet.

- On January 18, 2008, Officer Floyd again visited Dr. McKinney's office using the name "Anthony Wilson." Again, Dr. McKinney did not have or consult a patient file or medical chart for Officer Floyd. Dr. McKinney's cursory examination of Officer Floyd consisted of Dr. McKinney stating: "Stand up facing me and try to bend down and touch you[r] toes. Come back up. Alright, have a seat. Looks like you're doing a little bit better, huh?" (TR. 1/18/2008 N-8, at 19:53:45.) Dr. McKinney subsequently prescribed Xanax and Percocet.

- On January 18, 2008, Officer Arnold visited Dr. McKinney's office using the name "Richard Johnson." Officer Arnold did not fill out a basic patient information or medical history form. It was Officer Arnold's first visit to Dr. McKinney's office, but Officer Arnold said he was a returning patient. After a brief examination, Dr. McKinney asked "[h]ow you been doing since I put you on pain medication?", to which Officer Arnold replied "[p]retty good." (TR. 1/18/2008 N-9, at 19:02:37.) Dr. McKinney did not refer to any patient file or medical chart, and stated: "Okay, what I'm going to do is refill your medication." (TR. 1/18/2008 N-9, at 19:02:37.) Dr. McKinney subsequently prescribed Xanax and Percocet.

- On January 22, 2008, Officer Corporal Judge, using the name "Nicole Hodge," and Officer Coyne, using the name "John Rio," visited Dr. McKinney's office. It was Officer Coyne's first visit to Dr. McKinney's office, but he stated that he was a returning patient. After being directed to an examination room, Officer Coyne paid for both himself and Officer Hodge. He was then directed by Dr. McKinney to remove his shirt, after which Dr. McKinney touched Officer Coyne's neck and back. Dr. McKinney

23

did not inquire as to whether Officer Coyne had any symptoms or the reason for his office visit, but instead stated "you have back pain, right?" (TR. 1/22/2008 N-12, no timestamp listed.) Without referring to any patient file or medical chart, Dr. McKinney prescribed Xanax, Percocet, and Flexeril, a non-controlled substance.

- On January 30, 2008, Officer Floyd again visited Dr. McKinney's office. While he was waiting in the waiting room, Dr. McKinney came out to the waiting room and stated: "Who's [here] for prescription refills?" (TR. 1/30/2008 N-15, at 19:49:22.) When Officer Floyd approached Dr. McKinney, he stated "last time I ha[d] my wife with me, but she couldn't make it today, can I pick up her script for her?" (TR. 1/30/2008 N-15, at 19:56:00.) Dr. McKinney replied: "Your wife yeah, you can do that one time." (TR. 1/30/2008 at 19:56:00.) Dr. McKinney did not examine Officer Floyd, or refer to any patient files or medical charts for Officer Floyd or his ficticious wife. Officer Floyd then paid for both himself and his ficticious wife, and Dr. McKinney wrote prescriptions for Xanax and Percocet for Officer Wilson and his ficticious wife.

These audio transcripts show that the affidavits provided evidence that Dr. McKinney prescribed controlled substances in instances where he did not review a patient file or medical chart, performed only a cursory examination or no examination at all, or prescribed medication for a patient not physically present at his office. This indicates that the affidavit was not a "bare bones document," as the magistrate judge had significant evidence upon which to conclude that evidence of Dr. McKinney's potentially unlawful prescribing practices would be found at his office.

Second, regarding Dr. McKinney's vehicle, the affidavit indicates that during that the DEA/IDIS investigation, surveillance observed Dr. McKinney making trips from his office to his vehicle and placing items in the vehicle's glove compartment and/or trunk. Given the suspected illegal activity occurring inside Dr. McKinney's office, and the fact that Dr. McKinney was seen putting items into his car and driving to local banks, the Court finds that there was sufficient

probable cause to issue a search warrant for Dr. McKinney's vehicle, as there was a fair probability that evidence of Dr. McKinney's alleged crimes would be found in the vehicle.

Third, Defendant argues that even if probable cause existed that evidence of a crime would be found at Dr. McKinney's office, the search of the office and the vehicle was overbroad because the search should have been limited to evidence of the treatment of the undercover officers when they visited the office, thus making the seizure of thirty-one (31) boxes of medical records unwarranted. The Court does not agree.

The affidavit listed the specific items to be seized from Dr. McKinney's office, which included, among others, from October 5, 2004 through the present: all patient charts; all appointment books and patient records; all billing and claim records for patient visits; all records of purchases and prescriptions of controlled substances; all employee records; all payment records relating to Dr. McKinney's medical practice; all audit reports and/or inventory logs relating to controlled substances purchased and/or dispensed and/or prescribed; and financial and tax records relating to funds received from patients. While the list of items sought was indeed lengthy, and resulted in the government seizing a large volume of documents, this fact alone does not merit suppression. As the Third Circuit has made explicitly clear: "The Fourth Amendment does not prohibit searches for long lists of documents or other items provided that there is probable cause for each item on the list and that each item is particularly described." Ninety-Two Thousand, 307 F.3d at 148 (emphasis added).

Here, there was a fair probability that evidence of Dr. McKinney's alleged crimes would be found in the various files and documents sought by the government, including the thirty-one (31) boxes of medical files. Additionally, each item sought was particularly described in the

affidavits. "Although the scope of the warrant was certainly extensive, the warrant [itself] was not general," because it described in "inclusive generic terms what [was] to be seized." Id. at 149. The Court therefore finds that the affidavits contained sufficient probable cause to merit the seizure of the files and documents set forth in the affidavit, and thus, the warrant was not overbroad. See id. (defining an overly broad warrant as one which "authorizes the seizure of items as to which there is no probable cause." (emphasis added)). For this reason, the government's seizure of thirty-one (31) boxes of medical files was lawful.

## 2. **Good Faith**

Even if the affidavit did not establish probable cause to believe that evidence of Dr. McKinney's alleged crimes would be found in his office or vehicle, the Court still would not suppress the evidence because the good faith exception to the exclusionary rule, as set forth in Leon, 468 U.S. 897 (1984), applies here. Pursuant to the good faith exception, the suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993). The Supreme Court developed the exclusionary rule to deter unlawful police conduct. Leon, 468 U.S. at 906. However, where law enforcement officers act in the "objectively reasonable belief that their conduct d[oes] not violate the Fourth Amendment," "the marginal or nonexistent [deterrent] benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Id. at 918, 922. Thus, if an officer has obtained a warrant and executed it in good faith, "there is no police illegality and thus nothing to deter." Id. at 921.

"The test for whether the good faith exception applies is 'whether a reasonably well

trained officer would have known that the search was illegal despite the magistrate's authorization.'" United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999) (quoting Leon, 468 U.S. at 922 n.23). The Third Circuit has made clear that "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith[,] and justifies application of the good faith exception." Hodge, 246 F.3d at 307-308 (3d Cir. 2001) (citing Leon, 468 U.S. at 922). Nevertheless, the Third Circuit has identified four narrow situations in which an officer's reliance on a warrant is not reasonable and therefore does not trigger the good faith exception:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
> (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;
> (3) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or
> (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Ninety-Two Thousand, 307 F.3d at 146.

In the present case, Defendant does not contend that the affidavit contained deliberately or recklessly false information, that the Magistrate Judge abandoned her judicial role, or that the warrant failed to particularize the place to be searched or the things to be seized – exceptions one, two, and four. Instead, Defendant seems to rely on the third exception, arguing that the affidavit was so lacking in indicia of probable cause as to render official belief in the warrant's legality entirely unreasonable. For this exception to apply, Defendant must show "not just that the Magistrate Judge erred in issuing the search warrant at issue, but that the Magistrate Judge's error was so obvious that a law enforcement officer, without legal training, should have realized, upon reading the warrant, that it was invalid and should thus have declined to execute it." Id.

Here, as the Court's above-stated probable cause analysis has already shown, the affidavits at issue in this case contained sufficient indicia of probable cause to support the magistrate judge's finding of probable cause. See, e.g., Hodge, 246 F.3d at 309. Even if this were not the case, the warrants at-issue were "neither so general nor so plainly in violation of the particularity requirement that the executing officers could not have reasonably trusted in [their] legality." Id. At the very least, a reasonably well-trained law enforcement agent could have believed that there was adequate probable cause to support the search of Dr. McKinney's office and vehicle. Therefore, the Court cannot conclude that the warrants so lacked the requisite indicia of probable cause such that it was "entirely unreasonable" for the agents to believe otherwise. Because the agents executed the search in objectively reasonable reliance on validly-issued warrants, the good faith exception applies. Leon, 468 U.S. at 922.

For the aforementioned reasons, the Court finds that the search of Dr. McKinney's office and vehicle was supported by probable cause. Further, the Court finds that the warrants were executed by the agents in good faith reliance on validly issued search warrants.

**III.  Conclusion**

For the foregoing reasons, the Defendant's motions to suppress will be denied.

An appropriate Order follows.

O:\Criminal Cases\09-234 McKinney, US v\McKinney - Memo - Suppression issues - draft memo.wpd