IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.  09-234 |
| LAURENCE T. McKINNEY, M.D. | : | |

### GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by and through its attorneys, Michael L. Levy, United States Attorney for the Eastern District of Pennsylvania, and Anita Eve, Assistant United States Attorney, respectfully submits this Trial Memorandum to aid the Court in the above-captioned matter.

A. **The Indictment**

On April 8, 2009, a federal grand jury issued an indictment against Laurence T. McKinney, M.D., charging him with ordering the distribution of Percocet, a Schedule II controlled substance, and Xanax, a Schedule IV controlled substance, in violation of 21 U.S.C. § 841(a)(1) (Counts 1-48).  Both drugs are highly addictive, among the most frequently abused prescription drugs, and are frequently illegally distributed as "street drugs" which have a high illegal street market value.  McKinney was also charged with maintaining a place for the illegal distribution of controlled substances, in violation of 21 U.S.C. § 856(a)(1), based on the sustained use of his medical office for the sale of prescriptions of Percocet and Xanax for no legitimate medical purpose, rather than the usual course of a professional medical practice.

B.   **Elements of the Offenses**

In order to prove Counts 1 through 48, which charge violations of Title 21, United States Code, Section 841(a)(1), the government must establish the following elements:

1.   That the defendant distributed or dispensed a controlled substance;

2.   That he acted knowingly and intentionally; and

3.   That he did so other than for a legitimate medical purpose and in the usual course of professional practice.

See United States v. Norris, 780 F.2d 1207, 1209 (5th Cir. 1978)(distribution under § 841(a)(1)) (cited with approval in United States v. Rottschaefer, 178 Fed. Appx. 145, 146 (3d Cir. April 27, 2006) (unpublished). The indictment charges that the distributions were for "no legitimate medical purpose," which language, as noted above, was also cited with approval by the Third Circuit in Rottschaefer. Id. at 148.

The government intends to show that McKinney acted outside "the usual course of professional practice," and not "for a legitimate medical purpose." These are two different ways of describing the same standard. United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993); United States v. Singh, 54 F.3d 1182, 1187-88 (4th Cir. 1995). Case law on the government's burden of proof suggests that the trial court must engage in a case by case analysis of evidence to decide whether a reasonable inference of guilt may be drawn from specific facts. United States v. August, 984 F.2d 705, 713 (1992). A practitioner is not free to disregard prevailing standards of treatment. United States v. Vamos, 797 F.2d 1146, 1151 (2d Cir. 1986). But it is not the same as showing malpractice. To convict, the government must prove beyond a reasonable doubt that McKinney was acting outside the bounds of professional medical practice, "as his authority to

prescribe controlled substances was being used not for treatment of a patient, but for . . . other than a legitimate medical purpose, i.e. the personal profit of the physician." United States v. Tran Trong Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994).

Count 49 charges McKinney with maintaining a place for the distribution of controlled substances, in violation of 21 U.S.C. § 856(a)(1). The government must prove the following elements:

1. The defendant knowingly;

2. opened or maintained a place;

3. for the purpose of manufacturing by repackaging, distributing, or using any controlled substance.

In this case, the government intends to introduce evidence that we believe will show that McKinney knowingly operated a medical practice at 7514 Frankford Avenue, in Philadelphia and that he was the lessee of the property. The government then intends to demonstrate through evidence that McKinney maintained the premises "for the purpose" of illegally distributing controlled substances through the testimony of both his employees and patients. We believe this evidence will demonstrate that a large majority of McKinney's practice was devoted to the illegal distribution of prescriptions for controlled substances. It is believed that his employees will testify that McKinney got to the point in mid-2007 when he stopped paying his employees and that once he changed the focus of his practice to cater to drug seeking patients, rather than patients actually seeking pain therapy, he had patients lining up to get in and daily cash receipts ranging anywhere from $4,000 to $5,000.

With regard to satisfying the "for the purpose" element of the statute, it is believed that the Third Circuit has not addressed this question. Other circuits, however, have examined the contours of the term "for the purpose" and determined that the illegal purpose need not be the sole purpose for maintaining a place and for which a place is used. "Had Congress intended convictions under § 856 to be so limited to those who open or maintain facilities having cocaine manufacturing as their sole purpose, it would have said so. Such a narrow construction . . . would eviscerate the statute. . . ." United States v. Roberts, 913 F.2d 211, 220 (5th Cir. 1990). The Seventh Circuit has relied on a business analogy to interpret the term "for the purpose of" within the context of § 856(a)(1). In United States v. Banks, 987 F.2d 463 (7th Cir.1993), that court held "one way to tell whether a defendant had the requisite mental purpose under (a)(1) is to decide whether he acted as a supervisor, manager, or entrepreneur" in the drug enterprise, as opposed to someone who merely "facilitated the crime." Id. at 466-67. Thus, the more characteristics of an illegal business that are present, the more likely it is that the property is being used "for the purpose of" those drug activities prohibited by § 856(a)(1).

Under either of these tests, there is the fact that the majority of McKinney's business activities involved him writing prescriptions for patients who were simply seeking pain killers, rather than medical treatment. This is based on the volume of patients that frequented his office on a daily basis who were young and, from the perspective of McKinney's own staff, appeared to be able-bodied and with no apparent signs of being in pain. McKinney failed to examine or give medical attention to all of these patients. In addition, there is the remarkably high number of prescriptions for Schedule II, Schedule III and Schedule IV controlled substances that McKinney was issuing without any legitimate medical need. This evidence is compelling in establishing

that a primary purpose of McKinney maintaining the medical office was for the purpose of running a "pill mill."

### C.   Facts of the Case

The charges arise out of an investigation that demonstrated that McKinney, who operated a medical practice at 7514 Frankford Avenue, in Philadelphia, Pennsylvania, was registered with the United States Drug Enforcement Administration ("DEA"), DEA registration number BM7201267, to dispense to patients Schedule II through Schedule V controlled substances. As a medical doctor, McKinney was authorized to prescribe medicine to patients, including controlled substances, as long as he did so for a legitimate medical purpose and in the usual course of professional practice. A prescription for a controlled substance that did not meet this standard is an invalid prescription. Furthermore, the distribution of a controlled substance based upon an invalid prescription is an illegal distribution, however, the ordering of the distribution of a controlled substance by a medical doctor via a prescription is illegal and in violation of 21 U.S.C. §841(a)(1).

In November 2007, the DEA began to receive complaints from several pharmacies, including the Port Richmond Pharmacy, the district manager of several Rite-Aid Pharmacies located in Northeast Philadelphia, the Holmesburg Pharmacy, and Allegheny Apothecary, all located in and around the area of Frankford Avenue where McKinney's medical office was located. Representatives from each of the pharmacies reported receiving an excessive amount of prescriptions for Percocet and Xanax from Dr. McKinney.

In November 2007, the City of Philadelphia Police Department received a complaint and information about McKinney from a concerned citizen who resided in the area of Frankford

Avenue near McKinney's office. The citizen stated that he was hearing that if you called McKinney's office, scheduled an appointment, and told him you were referred by a neighbor in the Frankford area, he would tell you to come in and bring $100 cash with you. Once you arrived at McKinney's office, if you told him you had any type of ailment, he would write you a prescription for Xanax, Percocet, Oxycodone, and other drugs. The citizen further stated that McKinney saw as many as 40 patients a day and stayed opened until 9:00 p.m. on some nights. Finally, the citizen stated that the Oxford Circle Pharmacy located at Chelten and Horrocks Streets would not accept any prescriptions from McKinney; this was confirmed by the DEA.

      Law enforcement agencies, including the DEA and the City of Philadelphia Police Department, began an investigation of McKinney and undercover police officers visited McKinney's office and obtained prescriptions for, among other controlled and non-controlled substances, Xanax, a Schedule IV controlled substance, and Percocet, a Schedule II controlled substance. Prior to and at the time of the undercover officers' visits video recordings were made of McKinney's office and of the visits.

      Also during the investigation, DEA obtained a Commonwealth of Pennsylvania, Bureau of Narcotics Investigation BD6 report, which identified more than 3,000 prescriptions for Schedule II controlled substances dispensed by pharmacies in Pennsylvania on the order or prescription of Dr. McKinney from October 5, 2004 until November 30, 2007. The BD6 report was prepared by the Commonwealth of Pennsylvania based on information compiled by Atlantic Associates, a private company, which obtained its information from pharmacies doing business in the Commonwealth of Pennsylvania, which are required by law to report to the Commonwealth (through Atlantic Associates) all Schedule II controlled substances dispensed by

the pharmacies. The report indicated that all but three of the over 3000 Schedule II prescriptions from Dr. McKinney were for Percocet or other formulations containing the narcotic oxycodone, the active ingredient in Percocet.

  A medical expert was presented with summaries of the undercover police officers' visits to McKinney's office and the BD6 report. Based on this information, the expert opined that McKinney was operating his medical office as a prescription "pill mill," at which so-called patients can, for a fee, obtain medical prescriptions for controlled and non-controlled prescription drugs, without there being a legitimate medical purpose for these prescriptions.

  On February 5, 2008, DEA Diversion Investigator James Corbett obtained a warrant to search McKinney's office for patient-related information and financial records. As the result of the search, Investigator Corbett seized patient files. Investigator Corbett also interviewed McKinney's employees and McKinney.

  Following the search, McKinney appeared at a DEA administrative hearing regarding the suspension of his DEA registration. McKinney testified at the hearing.

  At the trial in this matter, the government intends to introduce testimony including, but not limited to, the following: pharmacists who filled prescriptions written on the order of McKinney and their prescription records; McKinney's employees; surveillance recordings of McKinney's practice made from outside the office and inside the office at the time of undercover police officers' visits to his office; the testimony of the undercover officers; McKinney's patients and prescriptions; his landlord; and, the medical expert who opined as to the lack of what appeared to be a legitimate medical purpose for prescriptions written by McKinney.

With regard to the medical expert, George E. Woody, M.D., whose curriculum vitae and medical report have been provided to the defendant, he is board-certified in psychiatry and neurology, and has been on the faculty of the School of Medicine for the University of Pennsylvania since 1971. He has added qualifications in addiction psychiatry. From 1971 until 1999, this doctor was on the staff at the Philadelphia Veterans Administration Medical Center and, for part of that time, Chief of the Substance Abuse Treatment Unit. This doctor has authored and co-authored numerous publications, including publications on: chronic pain; narcotic addiction; nonmedical use and abuse of scheduled medications for pain, pain-related symptoms, and psychiatric disorders; and, abuse and misuse of prescription opioids. The doctor was asked for his expert professional opinion on the McKinney's dispensing practices and the medical "examinations" engaged in by McKinney of the undercover officers. In summary, after reviewing the materials, Dr. Woody noted that the prescribing patterns evidenced in the BD6 report are not consistent with legitimate medical treatment, and that McKinney's practices are not consistent with the dispensing of controlled substances for a legitimate medical purpose, but are instead, "a drug selling/money-making operation under a very thin guise of medical practice."

**C.     Issues**

As the Court is aware, there currently remains the following motions:

1.     Defendant's Motion to Dismiss Indictment; and,

2.     Government's Motion to Admit Recordings.

**D.     Government's Witnesses**

The government intends to present the testimony of the witnesses identified on the attached Government Witness List, Attachment A.

E.   **Exhibits** 1/

The government intends to introduce the exhibits identified on the attached Government Exhibit List, Attachment B.

F.   **Stipulations**

The government and the defendant have not yet reached stipulations regarding any testimony or the introduction of exhibits.

G.   **Estimated Duration of the Trial**

Following jury selection, the trial of this case should take approximately one week, depending on the proofs offered by the defense, if any.

Respectfully submitted,

MICHAEL L. LEVY
United States Attorney


 /s/ Anita Eve
ANITA EVE
Assistant United States Attorney

---

1/   The government reserves the right to amend the exhibits offered at trial. The government anticipates introducing only portions of the audio-recordings set forth in the exhibit list.

9

## CERTIFICATE OF SERVICE

I certify that a copy of the Government's Trial Memorandum has been filed electronically on the Electronic Case Filing system and was served by electronic mail on the following defense counsel:

        Caroline Goldner Cinquanto, Esquire

        /s/ Anita Eve
        ANITA EVE
        Assistant United States Attorney

Date: March 15, 2010